IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CHESIRE MARTINEZ ROBINSON

CRIMINAL CASE NO.
1:10-CR-00129-MHS-RGV

**ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
FINAL REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and LCrR 12.1E(1).  Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court and

any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this 29th day of November, 2010.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CHESIRE MARTINEZ ROBINSON

CRIMINAL CASE NO.

1:10-CR-00129-MHS-RGV

**MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION**

Defendant Chesire Martinez Robinson ("Robinson") is charged in a four-count indictment with conspiring to commit child sex trafficking, in violation of 18 U.S.C. § 1594(c), child sex trafficking, in violation of 18 U.S.C. § 1591(a) and (b)(2), transporting a minor with the intent to engage in prostitution, in violation of 18 U.S.C. § 2423(a), and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). [Doc. 1]. Robinson has moved to suppress items seized during a warrantless search of a residence located at 3307 Tree Terrace Parkway, Austell, Georgia, including a 9mm handgun, a laptop computer, a camera, pill bottles, and a birth certificate. [Docs. 16 & 19]. Following an evidentiary hearing on the motion, the parties filed briefs on the issues raised by Robinson's motions, [Docs. 20, 35, 36,

& 37], and the matter is now ready for ruling.[1]  For the following reasons, the undersigned Magistrate Judge **RECOMMENDS** that Robinson's motions to suppress evidence, [Docs. 16 & 19], be **DENIED**.

## I. STATEMENT OF FACTS

On October 2, 2009, Federal Bureau of Investigation ("FBI") Special Agent Joseph Fonseca ("Agent Fonseca") was participating in an undercover investigation of possible child prostitution at a hotel in the Buckhead area of Atlanta, Georgia, as part of his duties connected with the Metro Atlanta Area Child Exploitation ("MATCH") task force.  (Tr. at 6).  Agent Fonseca and the MATCH task force had selected the hotel after conducting a review of several internet sites known to advertise prostitution,[2] and concluding that the hotel would be a good place to conduct an undercover sting operation.  (Tr. at 7).  Approximately eight MATCH task force officers were involved in the operation, including a parking lot

---

[1] See Doc. 34 for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the parties submitted exhibits at the September 21, 2010, hearing, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for Robinson's exhibits.

[2] The sites reviewed by Agent Fonseca prior to conducting the October 2, 2009, operation included Atlanta Back Page and City Vibe, among others.  (Tr. at 7).  Atlanta Back Page is an online newspaper that includes a classifieds section advertising, among other things, "personal services rendered," which includes "male seeking male," "casual encounters," and "adult escort."  (Tr. at 7-8). City Vibe is a website for escort services and prostitution.  (Tr. at 8).

surveillance team, lobby surveillance team, and undercover officers, all of whom were in radio contact with all other participating MATCH task force officers. (Tr. at 16-17).

While using the Atlanta Back Page and City Vibe websites, Agent Fonseca and MATCH Task Force Officer J.T. Summers ("Officer Summers") identified several potential advertisements for prostitution that depicted the same two girls, later identified as the victim ("S.B.") and Erica Clark ("Clark"), who appeared to possibly be underage. (Tr. at 9, 11-12, 58-59; Gov. Exs. 2-6). Because S.B. and Clark were possibly underage, the MATCH task force targeted them for "a date"[3] arranged by Officer Summers, who called the number listed in the advertisements and spoke with an unidentified female to finalize the terms for sex and the time of arrival. (Tr. at 9-12, 58). Officer Summers originally requested the white female depicted in the advertisement, later identified as S.B., because she looked to be the younger of the two girls, but he was told over the phone that S.B. was unavailable, so he requested the black female, later identified as Clark. (Tr. at 11).

When Clark arrived at the hotel, one of the surveillance team members radioed to Agent Fonseca and other MATCH officers that she had arrived in a silver Nissan Altima with a South Carolina license plate driven by another black female,

---

[3] "Date" is the euphemistic term used by MATCH task force investigators to refer to a meeting for the purposes of engaging in acts of prostitution. (Tr. at 10, 21).

later identified as Tera Riley ("Riley").  (Tr. at 17-18).  Clark proceeded to the room where an undercover officer was waiting, agreed to an exchange of money for sex, and was arrested.  (Tr. at 18).  Clark was identified, and the MATCH officers determined that she was 18.  (Tr. at 10, 18).  Clark was interviewed by MATCH officers, and when asked about S.B., Clark said she thought S.B. was under 18.  (Tr. at 61).  Clark confirmed that she worked for defendant Robinson as an escort or prostitute, and that she gave Robinson the money she made from these activities. (Id.).

When Riley returned to the hotel to pick up Clark, two MATCH task force officers, Detective Bennie Bridges ("Detective Bridges") and FBI Special Agent Nathan Whiteman ("Agent Whiteman"), both of whom were not in uniform,[4] contacted Riley in the parking lot.  (Tr. at 19-20, 102).  Detective Bridges identified himself to Riley while she was seated in her car, told her that the person she had driven to the hotel (Clark) was involved in an act of prostitution, and he asked Riley to come upstairs with him.[5]  (Tr. at 103-04, 125).  When she agreed, he led her

---

[4] Agent Fonseca described Detective Bridges' attire as "business casual with pants and a shirt, dress shoes."  (Tr. at 66).  Though Detective Bridges was armed, his gun was not visible.  (Tr. at 66, 103).  Agent Whiteman was also dressed in "plain clothes."  (Tr. at 89).

[5] Riley's testimony differed in that she recounted "it was a guy and a woman who told me that I need to come with them," and she claimed that neither the man nor the woman identified themselves as law enforcement "until [she] got on the

upstairs to the hotel room where Agent Fonseca was located.  (Tr. at 19-20, 63, 105).

Due to the fact that there was limited parking at the hotel, and Riley had parked in

a spot directly in front of the hotel where there was some danger she might have her

car towed, Agent Whiteman asked Riley if he could move her car across the street

where the MATCH officers had parked their cars.  (Tr. at 87).  Riley agreed, gave

Agent Whiteman her keys, and after moving her car, Agent Whiteman returned the

keys to Riley in the hotel room shortly before Riley left.  (Tr. at 73-74, 87).  Prior to

escorting her to the hotel room to speak with Agent Fonseca, Detective Bridges did

not handcuff or search Riley.  (Tr. at 62, 66-67, 104-05, 125).  Because the sting

operation was ongoing with a "date" occurring in one room, and Clark was being

held in another,  Agent Fonseca brought Riley into the "operation room"[6] where

approximately four other MATCH officers were monitoring the sting operation.[7]

(Tr. at 20, 63-65).

---

elevator, then they just said they was [sic] police officers and [she] need[ed] to come
back with them to the room."  (Tr. at 125).  Riley also said that at this time "they
snatched my phone out of my hand," and when she asked why she needed to go to
the room, one of them only told her "don't play dumb with me."  (Id.).

[6] Agent Fonseca described this room as a "suite," and said that it was "twice
the size of a normal hotel room."  (Tr. at 63).

[7] Riley testified that there were "maybe like fifteen to twenty, a little more"
officers in the hotel room when she arrived.  (Tr. at 126).

5

Agent Fonseca told Riley to sit on the bed away from the other MATCH officers, and asked her if she would be willing to speak with him. (Tr. at 20, 67-68). Riley spoke with Agent Fonseca after he introduced himself and began asking her questions. (Id.). Agent Fonseca was dressed in jeans, a casual shirt, and sneakers, and though he was armed, his firearm was not visible. (Tr. at 24-25). Agent Fonseca did not search or handcuff Riley while she was seated on the bed. (Tr. at 20, 25, 91-92, 126, 130). Throughout their conversation, Agent Fonseca described Riley's demeanor as "very agreeable," "upbeat," and "joking," and said that there were "periods during which she was making jokes."[8] (Tr. at 26, 99, 105). At no point did Agent Fonseca raise his voice, use physical force, or threaten Riley. (Tr. at 25, 130). Agent Fonseca did not tell Riley that she would be facing criminal charges if she did not cooperate.[9] (Tr. at 70). Riley appeared to understand Agent Fonseca's questions,

---

[8] At one point, Riley complimented one of the MATCH officers, Kelleita Thurman ("Officer Thurman") of the Atlanta Police Department, on her hair, and asked for her stylist's number. (Tr. at 99).

[9] Riley testified differently, and claimed that initially Agent Fonseca told her that she "had to cooperate with them," and that if she didn't "they [were] going to give me a charge [that] could lead to some time in prison or jail or whatever." (Tr. at 126, 127-28). Riley testified that after Agent Fonseca allegedly made these statements, she "didn't want to get [herself] in any trouble," that she was "shook up and kind of scared," and thereafter "didn't know that [she] could tell him no . . . didn't know [she] couldn't talk to him anymore or whatever." (Tr. at 129). On cross-examination, Riley said "they never made me upset. . . . it's that I . . . didn't want to go to jail." (Tr. at 143; see also Tr. at 154).

had no difficulty answering, did not refuse to answer any questions, and did not appear to be under the influence of alcohol. (Tr. at 25-26, 127-28).

Riley told Agent Fonseca that she was twenty-five years old, that she had graduated high school, and that she was taking college classes. (Tr. at 27). She also said that she had been previously arrested for driving with a suspended license and for drug possession or trafficking. (Id.). Agent Fonseca asked Riley about Clark, and Riley told him that she had brought Clark to the hotel because she had a "date." (Tr. at 21). Agent Fonseca showed Riley the advertisements that Officer Summers had used to contact Clark, (Gov. Exs. 2-6), and Riley confirmed that the advertisements depicted Clark. (Tr. at 22). Agent Fonseca asked Riley about the younger looking white female depicted in the advertisements, and Riley said that the girl was "like seventeen or eighteen years old," she was from South Carolina, and she was living with Riley and Robinson in their apartment located at 3307 Tree Terrace Parkway in Austell, Georgia. (Tr. at 22-23; 69, 123, 127, 147-48). Riley said that S.B. had been kicked out of her parents' home, and was working as a prostitute, sometimes giving Robinson the money she earned from prostitution. (Tr. at 159). Riley also said that S.B. had been shot, but that Robinson was not the one who had shot her. (Tr. at 128). When asked about Robinson, Riley said that Robinson was 28 years old, but had been in jail for the past ten years serving a sentence for armed

robbery, and that he paid half of the rent on the apartment they shared.  (Tr. at 29-30, 123, 127; Gov. Ex. 10).  She also confirmed that Robinson and Clark had a pimp/prostitute arrangement.  (Tr. at 30-31).  Riley said Robinson went by the street name "Candyman," which task force officers matched through searches of law enforcement databases to the name Chesire Robinson.  (Tr. at 31).  The MATCH officers also verified that Robinson had served a ten year sentence for armed robbery.  (Tr. at 31-32; Gov. Ex. 13).

Agent Fonseca asked Riley about the internet advertisements, and Riley said she had created them and taken the photos used in the advertisements.  (Tr. at 23-24).  Riley said that she had a computer at home that she used to upload the advertisements. (Tr. at 24).  Agent Fonseca asked Riley for permission to search her apartment, and Riley signed a written FBI consent to search form.  (Tr. at 24, 26-28; Gov. Ex. 26).  Agent Fonseca read the consent form, which included a sentence stating "I have been advised of my right to refuse consent,"[10] aloud to Riley while she sat on the bed.  (Tr. at 28; Gov. Ex. 26).  Riley asked no questions about the form,

---

[10] With regard to the advisement of the right to refuse consent, Agent Fonseca testified, "We were clear to tell her, it was such a friendly conversation, we wanted her to know that . . . she didn't have to let us search the house, period."  (Tr. at 28).

and both she and Agent Fonseca signed and dated the form.[11]  (Tr. at 27-28, 129-30,

153; Gov. Ex. 26).

Prior to leaving the hotel room, but after Riley had signed the consent to

search form, Agent Fonseca handcuffed Riley's hands and placed her in the

bathroom attached to the hotel room that the MATCH officers were using as an

operations center.[12]  (Tr. at 32-33, 71-72).  Riley remained handcuffed in the

---

[11] The consent form as filled out and signed by Riley reads in pertinent part:

1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of: 3307 Tree Terrace Parkway, Austell, GA.
2. I have been advised of my right to refuse consent.
3. I give this permission voluntarily.
4. I authorize these agents to take any items which they determine may be related to their investigation.

(Gov. Ex. 26).  Riley testified that she "didn't know what [Agent Fonseca] was like searching for, and maybe they was [sic] looking for the girl or not . . . I just told him that I gave him consent to search," but she "didn't know they was [sic] going to search like my whole entire house."  (Tr. at 129-30).

[12] Agent Fonseca testified that this was necessary due to the fact that Clark was being interviewed in one room, and a "date" was going on in another.  (Tr. at 32-33).  He sequestered Riley while he discussed his plan to search her residence with other MATCH officers, and he handcuffed her because he was concerned for her safety while she was alone in the bathroom due to the fact that another female left alone in the bathroom without restraints under similar circumstances during a previous operation had tried to hang herself.  (Tr. at 33, 72).  Agent Fonseca testified that he handcuffed Riley with her hands in front of her body, (Tr. at 23-33), but Riley testified that she was handcuffed with her hands behind her body, and she remembers this because she "couldn't scratch [her] nose" while in the bathroom. (Tr. at 131).

9

bathroom for approximately two and a half minutes[13] while the MATCH officers discussed their plan to search Riley's residence.  (Tr. at 33).  Riley did not attempt to leave the bathroom, or ask to be let out during this time.[14]  (Tr. at 73, 131).  Riley then came out of the bathroom, her handcuffs were removed, and Riley, Agent Fonseca, and other MATCH task force officers left the hotel to proceed to her apartment.  (Id.).

Agent Fonseca and two other MATCH officers, Detective Bridges and Officer Thurman, followed Riley as she drove  back to her apartment, a drive of 30-35 minutes.  (Tr. at 37-38, 74-75, 133-34, 144).  Agent Fonseca, Detective Bridges, and Riley each drove alone in their own vehicles,[15] and Officer Thurman drove with Clark as a passenger in order to transport her home.[16]  (Tr. at 38, 107).  Before Riley got into her car alone, Agent Fonseca asked her if she would mind if he held onto her phone until they got to her house because he was concerned that she might make a call while traveling to the apartment.  (Tr. at 38, 73).  Riley agreed to give

---

[13] Riley testified that she was in the bathroom "maybe like 15 or 20 minutes." (Tr. at 131).

[14] Riley testified that she did not try to leave the bathroom because she "was scared" and "didn't want any trouble."  (Tr. at 131).

[15] Detective Bridges was not certain whether he was in his own vehicle and testified, "I think I was in Agent Fonseca's car."  (Tr. at 107).

[16] Clark and Riley lived in the same apartment complex.  (Tr. at 38).

Agent Fonseca her phone, and Agent Fonseca returned the phone once they arrived at Riley's apartment.  (Tr. at 38-39).

After driving approximately 30-45 minutes, Riley, Agent Fonseca, Detective Bridges, and Officer Thurman arrived at Riley's residence:  3307 Tree Terrace Parkway in Austell, Georgia.  (Tr. at 39).  By the time they arrived, six or seven Douglas County Sheriff's deputies in plain-clothes, including Investigator John David Alley, Jr. ("Investigator Alley"), had already arrived at the apartment complex in three unmarked vehicles to assist with the search.[17]  (Tr. at 40, 77-78, 112-13, 115).  Investigator Alley had been instructed by his sergeant to assist Agent Fonseca with surveillance of Riley and Robinson's apartment and to look for a gray or silver Cadillac associated with Robinson.  (Tr. at 113).  While Investigator Alley was present, the Cadillac left and returned to the vicinity of the apartment several times, though Investigator Alley was too far away to see who got in or out of the Cadillac.  (Tr. at 114, 117).  As Riley, Agent Fonseca, and the other law enforcement officers pulled up to Riley's apartment, agents observed a black male, who had been seated on the balcony of the apartment, leave the balcony.[18]  (Tr. at 41, 109).

_____

[17] Agent Fonseca had called the Douglas County deputies to meet the MATCH task force officers at Riley's apartment.  (Tr. at 40, 113).

[18] Agent Fonseca believed that Robinson must have been the man on the balcony because Agent Fonseca asked Riley to call Robinson immediately after they entered the apartment, and Riley told him that the man who was on the balcony was

Riley opened the door of the apartment to allow Agent Fonseca and the other law enforcement officers present to enter.[19] (Tr. at 42, 79-80, 138). After opening the door, Riley entered the apartment and went straight to the back bedroom. (Tr. at 42, 79-80). Agent Fonseca and the other officers did not tell Riley to stop or otherwise obstruct her movement around the apartment, but did conduct a sweep of the apartment looking for other people for safety purposes. (Tr. at 42, 44). Agent Fonseca and the other officers then began a more thorough search of the apartment with Riley looking on. (Tr. at 45, 138). During the search, Riley was not restrained or confined to any area of the apartment, and she was not specifically escorted by any member of the search team.[20] (Tr. at 45, 52, 100, 110-11). Riley's outward

---

Robinson. (Tr. at 41, 78-79, 134-35). Agent Fonseca and Riley spoke with Robinson, and Agent Fonseca asked him to come back to the apartment to speak with him, but Robinson refused and hung up the phone. (Tr. at 41). Riley testified that the man on the balcony was Robinson's brother, Christopher Robinson, and that he fled because Riley mouthed to him words telling him that the police were behind her. (Tr. at 135-37).

[19] Riley said she felt at this time that she could not refuse to allow the officers present to enter the apartment because "they had already followed me all the way back over there," and she had "already signed the paper." (Tr. at 138).

[20] Detective Bridges testified that he "sat with Ms. Riley" in order to keep watch on her for officer safety reasons. (Tr. at 110). He did not, however, indicate that Riley was restrained or confined in any way during the search. (Id.).

12

demeanor remained calm, cooperative, and friendly.[21]   Searching officers located a

digital camera on a table adjacent to a couch in an area of the apartment

immediately inside the front door.  (Id.).  They located on the kitchen counter a pink

purse containing documents identifying Clark.  (Tr. at 45-46).   In the bedroom,

officers located a laptop computer on the bed, pill bottles on the dresser and floor

adjacent to the bed, and a gun and at least two cell phones underneath the left side

of the mattress.[22]  (Tr. at 46, 139, 145).   The laptop was sitting open on the bed, but

with a darkened screen.  (Tr. at 46, 80).  When Agent Fonseca touched the mousepad

area, the screen lit up and displayed the CityVibe advertisement depicting S.B. and

Clark.  (Tr. at 47, 80-81; Gov. Ex. 23).   Riley told Agent Fonseca that both the digital

camera and the laptop computer were hers.  (Tr. at 48, 81-82, 138-39, 162).   She also

said that the pills were hers, and that she had gotten them from a friend because she

had back pain, but that they were not prescribed to her.  (Tr. at 49).   Riley said that

---

[21] Officer Thurman said that during the search, "[Riley] didn't seem like she
was bothered at all," and even offered to give Officer Thurman some Kool-Aid.  (Tr.
at 100, 161).  Riley testified on cross-examination that she felt "comfortable because
I [knew] there was nothing so bad in my apartment that, you know, they couldn't
see."  (Tr. at 161).  She also testified that "I chose to cooperate.  I didn't want to go
to jail.  I didn't want any trouble."  (Tr. at 162).

[22] Searching officers looked under the mattress to find the firearm while Riley
was present in the bedroom.  (Tr. at 49-50).  Though Agent Fonseca testified that
Riley "seemed to be getting edgy to that side of the bed" and "seemed like she was
anxious" as the searching officers began to lift the mattress, she did not object to
them lifting up the mattress or make any move to stop them.  (Tr. at 49-50, 52).

the gun belonged to Robinson, and that she slept on the right side of the bed, while he slept on the left side of the bed where the gun was found.[23] (Tr. at 50-51). Riley gave Agent Fonseca permission to take the laptop, camera, purse, and pill bottles, and she signed a property receipt for those items. (Tr. at 51-52, 81, 100, 153, 162; Gov. Ex. 26). The gun, a Keltec 9mm handgun, was seized by Investigator Alley due to the fact that Robinson had been confirmed as a convicted felon. (Tr. at 53, 118-19).

## II. DISCUSSION

Robinson argues that the warrantless search of the 3307 Tree Terrace Parkway apartment was conducted in violation of his Fourth Amendment rights, and therefore the fruits of that search are due to be suppressed. Specifically, Robinson asserts that Riley's consent to search the residence was not knowingly, freely, and voluntarily given, and even if it was, the search exceeded the scope of any consent given.[24] [Doc. 16 at 5; Doc. 19 at 3-4]. The government responds that Riley's consent

---

[23] Riley testified that the gun belonged to a man named "New Orleans" who had broken into her house before Robinson lived there and had placed the gun under the mattress. (Tr. at 140-41, 155). She testified at the hearing that she believed the gun was not Robinson's because she had never seen Robinson with a gun, that he had "never been violent around [her]," and that Robinson "never committed any gun robbery or crime around [her]." (Tr. at 141).

[24] It is undisputed that Riley had the authority to consent to a search of any area of the apartment from which evidence was seized. See [Doc. 19 at 3-4 (quoting United States v. Dunkley, 911 F.2d 522, 525 (11th Cir. 1990) (per curiam) ("The Supreme Court has held that the voluntary consent of any joint occupant of a residence to search the premises is valid against the co-occupant, permitting

to search the residence was valid, that Robinson lacks standing to contest the search or seizure of the laptop and camera (which the government claims belonged exclusively to Riley), and even if Robinson had standing to contest the search or seizure of these items, Riley voluntarily gave the items to the FBI agents.  [Doc. 20 at 1-2].

## A.    Validity of Riley's Consent

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967) & Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971)). "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).  See also Schneckloth, 412 U.S. at 219;  United States v. Reynolds, 526 F. Supp. 2d 1330, 1336-37 (N.D. Ga. 2007). "[W]here the validity of a search rests on consent, the State has the burden of

_____

evidence discovered in the search to be used against the co-occupant at a criminal trial.") (citing United States v. Matlock, 415 U.S. 164, 169 (1974))); Doc. 20 at 10 (citing Georgia v. Randolph, 547 U.S. 103, 108 (2006)].  Additionally, neither party contests that Robinson had a reasonable expectation of privacy in the apartment, and therefore standing to contest the validity of Riley's consent.  See [Doc. 16 at 2; Doc. 20 at 9 n.2].

proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Id. (quoting Garcia, 890 F.2d at 360). Furthermore, "[t]he voluntariness of the consent must be judged in the light of the totality of the circumstances." Id. at 1535 (citing Schneckloth, 412 U.S. at 227). See also United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002) ("In determining the voluntariness of a defendant's consent, . . . a court must look at several factors, which include whether the defendant was free to leave, whether there was coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse to consent, whether the defendant could refuse to consent, the extent of the defendant's education and intelligence, and the defendant's belief that no incriminating evidence would be found.") (internal marks and citation omitted).

The totality of the facts and circumstances surrounding Riley's consent to search the apartment she shared with Robinson show that her consent was freely and voluntarily given. Riley was never under arrest or threatened with arrest, was

16

not forcibly detained prior to giving consent,[25] and she was advised of her right to refuse consent before giving it.[26] Riley was a high school graduate with some college education and prior experience with the criminal justice system,[27] who appeared to be at ease with the officers and cooperated readily, rather than reluctantly,[28] and she said she believed that no incriminating evidence would be found in her apartment.[29] Cf. Ramirez-Chilel, 289 F.3d at 752-53 ("[defendant] was free to walk around his residence at all times, [the investigating officer] spent over thirty minutes with the defendant, translating and reading the consent to search form before [defendant] signed it, [defendant] appeared to understand that he could refuse to consent . . . and, most importantly, [defendant] himself admitted during the suppression

_____

[25] Riley was not handcuffed, detained, or subject to any physical force prior to being questioned or giving consent, and she was not told that she was not free to leave or otherwise cooperate. See (Tr. at 62, 66-67, 103-05, 125, 125). Riley was also allowed to drive her own vehicle, unaccompanied to her residence. During the search of the apartment, Riley was free to move about and to observe the officers as they searched. See (Tr. at 45, 52, 100, 110-11).

[26] See (Tr. at 28; Gov. Ex. 26).

[27] Riley was a high school graduate and was taking college classes at the time she spoke with Agent Fonseca on October 2, 2009. (Tr. at 27). She had also been previously arrested for a drug offense and for driving on a suspended license. (Id.).

[28] See (Tr. at 26, 99, 100, 105, 161-62) (describing Riley's attitude and demeanor prior to giving consent and during the execution of the search of her residence).

[29] See (Tr. at 161).

17

hearing to consenting to the search because he knew he did not have any guns or 'bad things' in the trailer.").

The circumstances presented in this case are far less coercive than circumstances in which the Eleventh Circuit has held that consent was voluntarily given. Cf. United States v. Delancy, 502 F.3d 1297, 1302 (11th Cir. 2007) (consent for a full search of a home, including under a mattress, upheld where third party resident who gave consent "testified that one of the officers held a rifle pointed towards her and her children, and that she 'felt like a hostage. . . . like I was going to jail.'"); United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (holding consent voluntary where the defendant signed a consent to search his residence after he had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); Garcia, 890 F.2d at 361 (holding consent voluntary despite officers' refusal to accept suspect's conditional consent to search and threats to attempt to obtain a search warrant if the suspect did not consent to a full search of his residence); United States v. Long, 866 F.2d 402, 404 (11th Cir. 1989) (holding consent voluntary where officers asked for consent to search, stating that, if refused, they would return and "dig the place up" to attempt to find counterfeit currency they suspected was buried in the yard); United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (holding

18

consent voluntary despite fact that individual was arrested at gunpoint, forced to lie on the ground, and provided consent while one officer had his weapon drawn); United States v. Turner, 628 F.2d 461, 466 (11th Cir. 1980) (consent valid where "[t]here were repeated requests for permission to search within a three to five minute period . . . [defendants] stated they never felt free to walk away" and "the impression created by [the officer's] explanation was that a search would be conducted regardless of any objections [defendants] might raise.").

Moreover, Riley signed a written consent form, and testified that she "just told [Agent Fonseca] that I gave him consent to search." (Tr. at 129-30). Riley's testimony that she consented in order to avoid potential liability for unspecified "charges" does not alter the totality of the circumstances that otherwise weigh heavily in favor of finding that her consent to search the residence was freely and voluntarily given. Cf. Delancy, 502 F.3d at 1305 (in which "[t]he court [properly] rejected [the consenting party's] testimony that she consented only in response to threats" where it was "apparent [her] consent was not motivated by duress or threats by the officers but an attempt on her part to distance herself from the larger amount of drugs and dangerous guns and ammunition which she knew . . . were in the house"). See also United States v. Sanford, No. 3:06-cr-199-MEF, 2009 WL 2197373, at *5 (M.D. Ala. July 23, 2009), adopted at *1 (consent valid to search

19

residence even where consenting party, the mother of a fugitive who officers suspected was hiding in her house, testified that she consented because the officers allegedly "accused her of harboring a fugitive" and "she believed her choices were 'to cooperate or go to jail'"); United States v. Lima-Suarez, No. 1:05CR40-SPM, 2006 WL 763426, at *5 (N.D. Fla. Mar. 23, 2006) (consent to search residence deemed voluntary where "although [defendant] was not free to leave the property, he was not placed in handcuffs. He was allowed to move freely in the living room. . . . Only five agents were on the scene and they were cordial to [defendant and his family]. . . . [Defendant] was very cooperative throughout the search and showed the officers his weapon, the money, and the barn [where marijuana was growing]. Fourth, [defendant] was advised of his rights . . . and given the opportunity to refuse consent.").

Furthermore, for all the same reasons, Riley's consent to surrender all the items taken by law enforcement agents was valid because she allowed all of the items to be taken under the same set of circumstances. The consent to search form, which Agent Fonseca read aloud to Riley and which Riley signed, specified that it "authorize[d] these agents to take any items which they determine may be related to their investigation." (Gov. Ex. 26). Riley was allowed to move about her apartment and to freely observe as officers searched her apartment and asked her

20

questions about all of the items taken.  Riley testified that she told Agent Fonseca he could take the items, that he "didn't threaten [her] at all" prior to taking them, and that "he told me that my items would be returned to me."  (Tr. at 153-54).  Riley also testified that she "chose to cooperate" when she released the items because she "didn't want to go to jail" and "didn't want any trouble."  (Tr. at 161-62).  The Court finds that Riley's consent to allow Agent Fonseca to take the items removed from the apartment was voluntarily given pursuant to her own free will, notwithstanding the fact that her decision might have been motivated in part by a desire to distance herself from legal liability for Robinson's activities.  Cf. Sanford, 2009 WL 2197373, at *5.  The evidence in the record shows that her will was not overborne by a show of force or official authority, and therefore, her consent for the officers to search the apartment and to take the items discussed herein, was valid.  See  Tovar-Rico, 61 F.3d at 1536.

The government also argues correctly that Robinson has failed to establish that he has standing to challenge the taking of the computer or camera pursuant to Riley's consent.  See [Doc. 20 at 12].  On a motion to suppress, it is the defendant's burden to establish that he has a subjective expectation of privacy in the place or thing to be searched.  See United States v. Miravalles, 280 F.3d 1328, 1332-33 (11th Cir. 2002) (citing United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000)).

"'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" <u>Rakas v. Illinois</u>, 439 U.S. 128, 133-34 (1978) (quoting <u>Alderman v. United States</u>, 394 U.S. 165, 174 (1969)).   Consequently, to prevail on a claim that the government conducted an unconstitutional search or seizure under the Fourth Amendment, Robinson must first establish that he had a legitimate expectation of privacy in the place searched or thing seized that society is prepared to recognize as reasonable.  <u>Id.</u> at 133-34, 143 n.12.  <u>See also</u> <u>California v. Ciraolo</u>, 476 U.S. 207, 211 (1986) (standing to challenge search requires a subjective expectation of privacy that society would recognize as legitimate); <u>United States v. Baron-Mantilla</u>, 743 F.2d 868, 870 (11th Cir. 1984) (per curiam); <u>United States v. Rodriguez-Alejandro</u>, Criminal File No. 1:08-CR-363-TWT, 2009 WL 3377932, at *14 (N.D. Ga. Oct. 19, 2009), adopted at *1.  Here, all the evidence in the record shows that the camera and computer belonged to Riley, and Robinson has presented no evidence to show that, except for the gun,[30] any item taken by law enforcement on October 2, 2009 pursuant to Riley's consent was his property or that he had any legitimate Fourth Amendment interest

---

[30] Evidence in the record tends to show that only the gun seized by Douglas County Sheriff's Department officers belonged to Robinson, but seizure of the gun was based not on consent, but on the fact that officers had probable cause to believe that the gun was evidence of one of the crimes for which Robinson is charged: namely, a violation of 18 U.S.C. § 922(g).

in that property.[31]   Consequently, Robinson has not shown that the camera, computer, purse, or medication were seized in violation of his constitutional rights.

**B.   Scope of Riley's Consent**

Robinson also argues that the search went beyond the scope of Riley's consent, and therefore, any evidence found or taken outside of the scope of Riley's consent must be suppressed.  [Doc. 36 at 19-21].   "When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless."  United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992) (quoting United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991)) (internal marks omitted).  "Rather, it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass."  Id. (quoting Harris, 928 F.2d at 1117) (internal marks omitted).   In this case, Riley gave a generalized consent to search her apartment, and though Robinson argues that all parties involved were "under the impression that the purpose of the search was to try and find S.B. and discover whether or not she was under the age of 18," [Doc. 36 at 19], the evidence in the record shows that the searching officers did not exceed the scope of the consent Riley gave.

---

[31] The evidence in the record shows that the purse belonged to Clark, (Tr. at 45-46), and that the pills belonged to Riley or to one of her friends, (Tr. at 48-49). Robinson has not shown that he had any ownership interest in either of these items, and neither party has addressed either of these items in their briefs.

First, Agent Fonseca asked Riley for consent to search her apartment in the context of a conversation and interview that covered a number of topics, including S.B., Clark, Robinson, and the means by which Riley produced and published advertisements for prostitution on the internet.  In context, Agent Fonseca's request for general permission to search Riley's apartment was understandable as a request to search for anything related to the investigation involving S.B., Clark, or Robinson, and not necessarily limited to a search only for S.B. herself.  Second, Agent Fonseca had Riley sign a written consent form after reading it aloud to her, which clearly stated that the form authorized a "*complete* search of . . . 3307 Tree Terrace Parkway, Austell, GA," and "authorize[d] these agents to take *any* items which they determine may be related to their investigation."  (Gov. Ex. 26) (emphasis added).  Considering Riley's education and experience with the justice system, her assertion that she "didn't know they was [sic] going to search like my whole entire house," (Tr. at 129-30), is simply not credible.

Finally, Riley was present during the entire search, and was allowed to move freely about her apartment and observe as officers searched.[32]  Cf. United States v. Street, 472 F.3d 1298, 1308-09 (11th Cir. 2006) (where defendant signed an identically

---

[32] Agent Fonseca testified that prior to signing the consent form, "we wanted her to know that . . . she didn't have to let us search the house, period," (Tr. at 28), and during the search, "she was never told to stay in any one spot.  I wanted her to see everything that we were searching."

worded FBI consent to search form, was "free to move about [his house]" during the search, and where "[n]owhere in or on the form he signed did [defendant] indicate a desire to restrict the search . . . [n]or did he otherwise indicate to the agents that he wanted to exclude any property from the scope of the search[,] . . . [t]he agents' belief that the police radio, in plain view on the bedroom floor, was within the scope of the consent was reasonable.") (citing United States v. Melendez, 301 F.3d 27, 33 (1st Cir. 2002));  Ramirez-Chilel, 289 F.3d at 752-53.  If Riley intended the scope of her consent to be limited, she had ample opportunity to object or clarify, especially in light of the cordial, even friendly, tone of communications she had with the MATCH task force officers before and during the search.  See Street, 472 F.3d at 1308-09; Lima-Suarez, 2006 WL 763426, at *5.  Consequently, Robinson's motions to suppress evidence found and taken pursuant to Riley's consent is due to be denied.

## III.  CONCLUSION

For the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that Robinson's motions to suppress evidence, [Docs. 16 & 19], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 29th day of November, 2010.

*Russell G. Vineyard*

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE