UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,          :

    Plaintiff,                                      :

                                                                                           CRIMINAL ACTION NO.

v.                                                       :

                                                                                        1:10-CR-129-MHS

CHESIRE ROBINSON,                 :

    Defendant.                                  :

## ORDER

This action is before the Court on defendant's motion to suppress evidence, the Magistrate Judge's Report and Recommendation ("R&R") recommending that the motion be denied, and defendant's objections to the R&R. After a de novo review, the Court overrules the objections, adopts the R&R, and denies defendant's motion.

Background

Federal Bureau of Investigation ("FBI") Special Agent Joseph Fonseca ("Agent Fonseca") was participating in an undercover investigation of possible child prostitution at a hotel in the Buckhead area of Atlanta, Georgia. Agent Fonseca and other officers with the Metro Atlanta Area Child Exploitation

("MATCH") task force were involved in the operation. Agent Fonseca and Officer J.T. Summers identified several potential advertisements for prostitution that depicted the same two girls, later identified as the victim, S.B., and Erica Clark ("Clark"), who the officers believed appeared underage. Due to this belief, the MATCH task force targeted them for a "date."[1] Officer Summers arranged for the "date" by calling the number listed in the advertisements and spoke with an unidentified female to finalize the terms for sex and the time of arrival. Officer Summers requested the white younger looking female from the advertisement, S.B., but was informed she was unavailable. Therefore, he requested the black female, later identified as Clark.

MATCH officers observed Clark arrive at the hotel in a silver Nissan Altima with South Carolina license plates driven by another black female, later identified as Tera Riley. Clark proceeded to the hotel room, agreed to an exchange of money for sex with an undercover officer, and was arrested. MATCH officers interviewed Clark, and she said that she believed S.B. was

---

[1] A term used by MATCH officers to refer to a meeting for the purposes of engaging in acts of prostitution.

under 18. Clark further confirmed that she worked for defendant Chesire Robinson as an escort or prostitute, and that she gave defendant the money she made from her escort/prostitute activities.

Subsequently Ms. Riley returned to the hotel to pick up Clark, and at least one officer not in uniform approached Ms. Riley in the parking lot. While still in her car, the officer told Ms. Riley that Clark was involved in an act of prostitution and asked Ms. Riley to come with him. Ms. Riley contends that no one would answer her inquiry as to why she needed to go up to the hotel room, but regardless, she agreed to follow the officer to the hotel room where Agent Fonseca was located.

FBI Special Agent Nathan Whiteman asked Ms. Riley if he could move her car across the street because she had parked directly in front of the hotel and there was a chance her car might be towed. She agreed and gave him her car keys. Agent Whiteman returned the keys to Ms. Riley shortly before she left the hotel.

3

Upon arriving at the hotel room, Agent Fonseca brought Ms. Riley into one room of a suite hotel room, where other MATCH officers were monitoring the sting operation. He brought her to this room because officers were holding Clark in another room in the suite. Agent Fonseca told Ms. Riley to sit on a bed away from the other MATCH officers, and he asked her if she would be willing to speak with him. Ms. Riley testified at a hearing before the Magistrate Judge that the officers told her that they were "going to give [her] a charge and to could lead [sic] to some time in prison or jail or whatever." Motion to Suppress Hearing Transcript, August 17, 2010, Transcript (hereinafter "Tr.") at 126. Agent Fonseca testified that he did not tell her that she would be facing criminal charges if she did not cooperate. Ms. Riley further testified that even though she was scared and did not want to go to jail, that the officers never made her upset. Indeed, Agent Fonseca described Ms. Riley's demeanor as very agreeable, upbeat, and joking. According to Agent Fonseca, Ms. Riley had no difficulty answering any of his questions, did not refuse to answer any questions, and did not appear to be under the influence of alcohol. Agent Fonseca was dressed in casual clothing and his firearm was not visible.

Ms. Riley provided Agent Fonseca with the following information: she was twenty-five years old; had graduated high school and was taking college classes; and was previously arrested for driving with a suspended license and for drug possession and trafficking. She explained that she had brought Clark to the hotel because she had a "date," and Ms. Riley confirmed that the advertisements Officer Summers had used to contact Clark actually depicted Clark. Ms. Riley further stated that the white younger looking girl in the advertisements, identified as S.B., was seventeen or eighteen years old, from South Carolina, and was living with Ms. Riley and defendant at 3307 Tree Terrace Parkway in Austell, Georgia. Ms. Riley said that S.B. had been kicked out of her parents' home, was working as a prostitute, and sometimes gave the money she earned from prostituting to defendant. She further said that S.B. had been shot but not by defendant.

Regarding defendant, Ms. Riley stated that he was twenty-eight years old, had been in jail for the past ten years serving a sentence for armed robbery, and paid half of the rent on the apartment he shared with Ms. Riley. She confirmed that defendant and Clark had a pimp/prostitute relationship. Ms. Riley told Agent Fonseca that defendant went by a street name,

"Candyman," which the MATCH officers matched through searches of law enforcement databases to defendant and confirmed that he had served a ten year sentence for armed robbery.

Regarding the internet advertisements, Ms. Riley told Agent Fonseca that she had created them and taken the photos used in the advertisements. She said that she had a computer at home that she used to upload the advertisements.

Agent Fonseca asked Ms. Riley for permission to search her apartment. Ms. Riley signed a written FBI consent to search form. The consent form included a sentence stating that she had been advised of her right to refuse consent, and Agent Fonseca read the consent form aloud to her. Ms. Riley did not ask any questions about the consent form, and both she and Agent Fonseca signed and dated the consent form.

Prior to this point, no one had handcuffed or searched Ms. Riley. Agent Fonseca then handcuffed Ms. Riley's hands and placed her in the bathroom attached to the hotel room that the MATCH officers were using as an

operations center. Agent Fonseca explained at the hearing that he had done this out of a concern for her safety due to the fact that another female left alone in a bathroom without restraints under similar circumstances had tried to hang herself. He further explained that he had handcuffed Ms. Riley because another "date" was going in another room and officers were interviewing Clark in another room. Ms. Riley was handcuffed in the bathroom approximately two and a half minutes while the MATCH officers discussed their plan to search Ms. Riley's apartment. Officers then removed the handcuffs from Ms. Riley, and she, Agent Fonseca, and other MATCH offices left the hotel to go to her apartment.

Agent Fonseca, Detective Bridges, and Ms. Riley each drove their own vehicles on the thirty to thirty-five minute drive to Ms. Riley's apartment. Agent Fonseca and two other MATCH officers as well as Detective Bridges followed Ms. Riley. Officer Thurman drove Clark in order to transport her and also followed Ms. Riley. Agent Fonseca asked Ms. Riley for her phone before driving back to her apartment because he was concerned that she might make a call while traveling to the apartment, and Ms. Riley agreed to

7

give him her phone. Agent Fonseca returned the phone to Ms. Riley when they reached her apartment.

When Ms. Riley, Agent Fonseca, Detective Bridges, and Officer Thurman arrived as Ms. Riley's residence at 3307 Tree Terrace Parkway in Austell, Georgia, six or seven Douglas County Sheriff's deputies in plainclothes had already arrived at the apartment complex in three unmarked vehicles to assist with the search. As Ms. Riley arrived at her apartment, agents observed a black male, who had been seated on the balcony of the apartment, leave the balcony.

Ms. Riley opened the door of her apartment to allow Agent Fonseca and other law enforcement officers to enter. Ms. Riley entered the apartment and went straight to the back bedroom. Agent Fonseca and other officers conducted a sweep of the apartment and did not obstruct Ms. Riley's movement around the apartment. While Ms. Riley looked on, Agent Fonseca and the other officers began a more thorough search of the apartment. Ms. Riley was not confined to any area, and she was not specifically escorted by

any member of the search team. Ms. Riley remained cooperative and friendly.

Searching officers located a digital camera on a table next to a couch in a living area immediately inside the front door. They also found a pink purse containing documents identifying Clark on the kitchen counter. In the bedroom, the officers located a laptop computer on the bed, pill bottles on the dresser and floor next to the bed, and a gun and at least two cell phones underneath the left side of the mattress. The laptop was sitting open on the bed, but the computer screen was dark. When Agent Fonseca touched the mousepad area, the screen lit up and displayed the internet advertisement depicting S.B. and Clark. Ms. Riley told Agent Fonseca that the digital camera and the laptop were hers. She said the pills were also hers and that she had received them from a friend because she was having back pain, but they had not been prescribed to her. Ms. Riley said the gun belonged to defendant, that she slept on the right side of the bed, and that defendant slept on the left side of the bed, where the gun had been found. Ms. Riley gave Agent Fonseca permission to take the laptop, camera, purse, and pill bottles, and she signed a property receipt for these items. Investigator David

9

Alley, Jr., with the Douglas County Sheriff's Department, seized the gun, a Keltec 9mm handgun, due to the fact that defendant had been confirmed as a convicted felon.

Discussion

The R&R recommends denying defendant's motion to suppress. The Magistrate Judge found that under the totality of the circumstances, Ms. Riley's consent was freely and voluntarily given and that Ms. Riley's consent to surrender the items taken by law enforcement agents was valid. The R&R further stated that defendant failed to establish that he had standing to challenge the taking of the computer or camera pursuant to Ms. Riley's consent. The Magistrate Judge found that the evidence showed that the searching officers did not exceed the scope of the consent Ms. Riley gave. As for the seized gun, the R&R stated that the officers had probable cause to believe that the gun was evidence of one of the crimes for which Robinson was charged, namely a violation of 18 U.S.C. § 922(g).

As an initial matter, as the R&R noted, defendant has not shown that he had any ownership interest in the purse that belonged to Clark, the pills

that belonged to Ms. Riley or to one of her friends, or the camera or computer that belonged to Ms. Riley. Therefore, defendant had no Fourth Amendment interest in the pills, purse, camera, or computer, and lacks standing to challenge the seizure of these items. See California v. Ciraolo, 476 U.S. 207, 211 (1986) (standing to challenge search requires a subjective expectation of privacy that society would recognize as legitimate). Accordingly, he cannot show that officers seized these items in violation of his constitutional rights. See United States v. Baron-Mantilla, 743 F.2d 868 (11th Cir. 1984).

Defendant makes several objections to the R&R: (1) the Magistrate Judge erred by making certain findings of fact and basing his factual conclusions on the testimony of law enforcement witnesses, despite the fact that there was conflicting testimony; (2) Ms. Riley's consent was not voluntary or freely given; (3) the officers' search exceeded the scope of the consent Ms. Riley allegedly gave; and (4) the Magistrate Judge erred by concluding that the gun seized by officers was done so pursuant to a determination by officers that there was probable cause to believe that the gun was evidence of one of the crimes for which defendant was charged.

11

1. Credibility Determinations

Defendant objects to the R&R arguing that the Magistrate Judge failed to make any credibility findings in the R&R, based his factual conclusions on the testimony of law enforcement witnesses even though there was conflicting testimony in the record, and failed to explain why he chose to believe the officers over other testimony. Defendant requests the Court rehear the testimony heard by the Magistrate Judge and review the Magistrate Judge's credibility findings.

A district judge has broad discretion to accept, reject, or modify a magistrate judge's proposed findings and recommendations. United States v. Raddatz, 447 U.S. 667, 680 (1980). When a party files an objection to a finding of fact by a magistrate judge, the district court must conduct a de novo review of the record with respect to the factual issue. LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir. 1988). De novo review does not require a new hearing of witness testimony, but it does require independent consideration of factual issues based on the record. Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga., 896 F.2d 507, 513 (11th Cir. 1990). "To the extent that the magistrate has made findings of fact based upon the

testimony of the witnesses heard before the magistrate, the district court is obligated to review the transcript or listen to the tape-recording of those proceedings." LoConte, 847 F.2d at 750.

The Court has reviewed the record and read the transcript from the Magistrate Judge's hearing on defendant's motion to suppress held on August 17, 2010. The Court has made an independent factual determination and agrees with the Magistrate Judge's credibility assessments.[2]

2. Ms. Riley's Consent

Defendant argues that Ms. Riley's consent was not voluntary or freely given. Defendant asserts that Ms. Riley testified that she consented because the officers told her that she was going to receive a "charge" or that her failure to cooperate might lead to jail time, and therefore, Ms. Riley's consent was not voluntary. Tr. at 126. However, Ms. Riley further testified that while at the hotel, the officers never made her upset and that she did not

---

[2] Defendant has not cited any authority showing that the Magistrate Judge was required to specifically set forth in detail why he found one witness more credible than another. It is clear from the R&R that after weighing the testimony of the witnesses before him, the Magistrate Judge found certain testimony more credible than others.

want to go to jail. She also testified that she chose to give the officers consent to search her apartment. The Court agrees with the R&R's analysis that the totality of the circumstances and facts surrounding Ms. Riley's consent to search the apartment show that her consent was freely and voluntarily given.[3]

### 3. The Scope of the Search

Defendant argues that the officers' search exceeded the consent given by Ms. Riley because Ms. Riley did not know that the officers were going to search her entire apartment. After a de novo review, the Court finds that the R&R is correct. The scope of a permissible search is constrained by what a police officer could reasonably interpret the consent to encompass. United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992). Agent Fonseca read the consent form to Ms. Riley aloud, and the form included notification that Ms. Riley could refuse to consent to the search. Agent Fonseca testified that he explained to Ms. Riley more than once that she did not have to let the officers search the apartment and that she could interrupt the search once it

---

[3] As a co-occupant of the apartment with defendant, Ms. Riley had authority to consent to a search of any area of the apartment from which evidence was seized. United States v. Dunkley, 911 F.2d 522, 525 (11th Cir. 1990).

14

began if she chose to do so. Agent Fonseca described their conversation as friendly and noted that Ms. Riley did not ask any questions about the consent form.

Ms. Riley testified that Agent Fonseca told her that she had given consent to come to her house and to search and that she did not know what they were searching for: "[Agent Fonseca] told me that I gave him consent to come to my house and search, but I didn't know, didn't know, I didn't know they was like searching for, and maybe they was looking for the girl or not. I don't know. [generally sic]" Tr. at 129-130. She further testified that she "chose to cooperate." Tr. at 162. Moreover, even though Ms. Riley testified that she believed she did not know they were going to search her entire apartment, testimony the Magistrate Judge found to be not credible, Ms. Riley also drove her car to her apartment while officers followed her, never stopped the officers from coming into her apartment, was never restrained inside her apartment, never stopped the search while it was ongoing, was friendly to the point of offering officers kool-aid beverages during the search, and testified that she felt comfortable because she knew there was nothing "so bad" in her apartment. Tr. at 161. Therefore, the officers did not exceed

15

the consent given by Ms. Riley in conducting their search. See United States v. Ramirez-Chilel, 289 F.3d 744, 752-53 (11th Cir. 2002).

Defendant also argues that the search of Ms. Riley's apartment exceeded the scope of what the parties understood to be the object of the search. Defendant maintains that the purpose of the officers' search was to try to find S.B. and discover whether she was under the age of 18. However, Agent Fonseca testified that the basis for the search was to find anything that would show the officers that there was some kind of juvenile prostitution occurring at the apartment, if S.B. in fact turned out to be juvenile. Ms. Riley testified that she told Agent Fonseca that S.B. was either 17 or 18, S.B. was living in her apartment, and Ms. Riley has used a camera and computer to take pictures of S.B. for uploading them to the internet. Therefore, both the camera and the computer were relevant to whether juvenile prostitution was occurring at the apartment. Moreover, pursuant to the consent form Ms. Riley signed, the agents could take any items which they determined may be related to their investigation, and Ms. Riley testified more than once that she allowed Agent Fonseca to take the computer and the camera. Therefore, the

16

Court finds that the officers' search was not excessive in scope and did not exceed the consent given by Ms. Riley.

4. Seizure of the Firearm

In a footnote, defendant objects to the Magistrate Judge's conclusion of law that the gun seized from in between two mattresses was done so pursuant to a determination by law officers that there was probable cause to believe that the gun was evidence of one of the crimes for which defendant was charged, namely a violation of 18 U.S.C. § 922(g). The Court agrees with the R&R that the seizure of the gun was lawful.

Agent Fonseca testified that there "was already a probation issued for [defendant] as being a convicted felon. The weapon was indicative of him being a felon in possession." Tr. at 53. Agent Fonseca testified further he talked with Ms. Riley about the gun, and she told him that it was defendant's gun and that defendant slept on the side of the bed where the gun was found. This was sufficient for the officers to have probable cause to believe that

17

defendant had constructive possession of the gun.[4] See <u>United States v. Davis</u>, 345 Fed. Appx. 477, 478-479 (11th Cir. 2009) (constructive possession existed where officers found a gun in a trailer they believed belonged to defendant and in a bedroom where defendant slept, and a third person who was at the trailer testified that the defendant lived in the trailer and owned guns). Therefore, knowing that defendant was a convicted felon and it was illegal for him to possess the firearm pursuant to 18 U.S.C. § 922(g), it was proper for the officers to seize it.[5] <u>See id.</u>; <u>United States v. Barrow</u>, No. 10-20622-CR-UNGARO/SIMONTON, 2010 U.S. Dist. LEXIS 138373, at *12 (S.D. Fla. Nov. 16, 2010) (seizure of a gun was proper where officers knew the defendant was a convicted felon and defendant's presence and actions near a car where the gun was found were sufficient to establish probable cause to

---

[4] Ms. Riley testified that the gun belong to a man named "New Orleans," who had broken into her house earlier. She testified that it could not have been defendant's gun because she had never seen him with a gun and he was not violent. Defendant argues that Ms. Riley testified that the gun belonged to a prior boyfriend of hers who had placed the gun under the mattress, but the testimony does not show this. After a <u>de novo</u> review and reading the transcript from the hearing, the Court finds Agent Fonseca's testimony to be credible and more credible than Ms. Riley's. Further, after hearing live testimony and observing the witnesses, the Magistrate Judge's decision to find Agent Fonseca's testimony to be more credible than Ms. Riley's was not in error.

[5] Douglas County Sheriff's Department officers collected the gun.

believe that defendant had constructive possession of the gun). Accordingly, the Court agrees with the R&R that the officers properly seized the gun because they had probable cause to believe that the gun belonged to defendant and they knew he was a convicted felon. See 18 U.S.C. § 922(g).

Conclusion

For the foregoing reasons, the Court OVERRULES defendant's objections [#44], ADOPTS the Magistrate Judge's Report and Recommendation [#40], and DENIES defendant's motion to suppress evidence [#16, #19].

IT IS SO ORDERED, this 24 day of January, 2011.

Marvin H. Shoob, Senior Judge
United States District Court
Northern District of Georgia